## FESLER, CLERK, ET AL. *v.* BRAYTON.

[No. 17,894.   Filed May 15, 1896.]

CONSTITUTIONAL LAW.—*Amendment of Constitution Repeals Inconsistent Legislative Acts.—Repeal by Implication.*—A constitutional amendment inconsistent with previous legislative enactments operates to repeal such enactments. *p. 75.*

SAME.—*Unconstitutional Apportionment Act.—Repealing Clause.*— Where it appears from the repealing clause of an apportionment act, that it was only intended to repeal the former apportionment upon the supposition that the new one was to take the place of the former, the former act will not thereby be repealed, if the new act is unconstitutional. *p. 76.*

SAME.—*Apportionment Act.—Public Policy.*—Where there is but one act apportioning the State for legislative purposes that has not been repealed, an action will not lie to invoke the powers of the court to declare it unconstitutional. *p. 87.* MONKS, J., dissenting.

From the Marion Superior Court.    *Reversed.*
*Hawkins & Smith,* for appellants.

*M. E. Forkner, A. C. Harris,* and *Miller, Winter & Elam,* for appellee.

McCABE, J.—The appellee sued the appellants in the superior court, to enjoin them from proceeding to hold the election in November for members of the next general assembly, under the provisions of the apportionment act, approved March 6, 1885. It was alleged that the appellants, being the clerk of the circuit court, the auditor, and the sheriff of Marion county, Indiana, were threatening to give notice and proceed to an election under said act, which act, it was alleged, is unconstitutional for the same reasons that the apportionment acts of 1879, 1891, 1893, and 1895 were adjudged by this court to be unconstitutional in *Parker* v. *State,* 133 Ind. 178, and in *Denny* v. *State, ex rel.,* 144 Ind. 503.

The superior court overruled a demurrer to the complaint for want of sufficient facts, and the defendants declining to plead over and standing upon their demurrer, the court rendered judgment perpetually enjoining said officers from proceeding to hold said election under and pursuant to said act.

The ruling upon the demurrer is the only error assigned.

A motion to dismiss the appeal is made by Alonzo G. Smith, Charles A. Korbly and John W. Kern as *amici curiae,* and on behalf of certain other parties, who are not parties to the action, and who, it is alleged, would be injuriously affected by the litigation.

In support of this motion is filed an affidavit of Sterling R. Holt, to prove the charge made in the motion that "the controversy is not real, that all the parties thereto are agreed in principle and purpose

concerning the same, and that said action, from its inception, has been and is collusive and the result of collusion between the parties thereto, all of whom are desirous of obtaining from this court an affirmance of the judgment appealed from, there being no adverse interest represented."

If these facts were conceded, or clearly shown by the affidavits and record, we should feel compelled to sustain the motion, as the law is well settled that such a litigation may and ought to be regarded as a con tempt of court. *Hoover* v. *Hanna*, 3 Blackf. 48; *Brewington* v. *Lowe*, 1 Ind. 21; *Hotchkiss* v. *Jones*, 4 Ind. 260; *Smith* v. *Railroad Co.*, 29 Ind. 546; *Osborn* v. *Bank of U. S.*, 9. Wheat. 737; *Lord* v. *Veazie*, 8 How. U. S. 251; *State, ex rel.*, v. *Napton* (Mont.), 25 Pac. Rep. 1045; *Haley* v. *Eureka Co. Bank* (Nev.), 12 L. R. A. 815.

Counter affidavits have been filed by the parties and counsel in opposition to the charge of collusion. Other circumstances have occurred in this court tending to overcome the charge. But we deem the merits of the controversy of so much importance to the people that we do not pass upon the conflict raised by the affidavits, and will pass the question of dismissal without decision. The brief, on behalf of the appellants, makes a point for reversal which is entitled to much consideration, namely, it is therein contended, with much apparent earnestness, that "the act of 1885 was accepted by the people, and acted upon without question, and three successive general assemblies were elected under it before any further legislation upon the subject was attempted, and before any question of its constitutionality was raised, and * * * no attempt was ever made or suggested to test its validity or constitutionality in the courts. The law having been accepted and acted upon, as it has been without

question by the people, * * * we insist that it is now too late to raise the question as to its validity upon the grounds stated in the complaint."

This contention is not without weight or merit, especially as this is an attempt to invoke the equity powers of the court by injunction. "Equity aids the vigilant, not those who slumber on their rights. * * * The principle thus used as a practical rule, controlling and restricting the award of reliefs, is designed to promote diligence on the part of suitors, to discourage laches by making it a bar to relief, and to prevent the enforcement of stale demands of all kinds, wholly independent of any statutory periods of limitation. It is invoked for this purpose in suits for injunction, suits to obtain remedy against fraud, and in all classes of cases, except, perhaps, those brought to enforce a trust against an express trustee. * * * A court of equity which is never active in relief against conscience, or public convenience, has always refused its aid to stale demands where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence." 1 Pomeroy Eq. Jur. (1 ed.), sections 418, 419; *Brashear* v. *City of Madison*, 142 Ind. 685; *Jones* v. *Cullen*, 142 Ind. 335; *Rumsey* v. *People*, 19 N. Y. 41.

In addition to the fact that the appellee does not point out any other apportionment act than that of 1885, or claim that any such exists, under which an election may be held, we may observe that he agrees with the contention of the *amici curiae*, that all legislative apportionment acts previous to that of 1879, under the present constitution, including the apportionment act under which that constitution required the first and second legislative elections to be held, were required to be, and were, based on an enumera-

tion exclusively of the white male inhabitants of the State.   Section 2, Art. 3, Const. 1816, R. S. 1843, p. 44; Const. of 1851, sections 3, 4, 5, Art. 4, R. S. 1852, pp. 48 and 49; Enumeration Act of 1865, Acts of 1865, p. 41, R. S. 1881, sections 4780, 4798; Supp. Enumeration Act of 1877, Acts of 1877, R. S. 1881, section 4799 (R. S. 1894, section 6370).

By the amendment to the constitution of March 14, 1881, the sections of the constitution above referred to, were so amended as to require such enumerations and apportionments to be based on the number of male inhabitants of the State, over the age of twenty-one years, both white and colored.   R. S. 1894, sections 99, 100, and 101 (R. S. 1881, sections 99, 100, and 101).

All the apportionment acts, therefore, which preceded that of 1879, being based exclusively on the white male inhabitants of the State above the age of twenty-one years, and leaving out all colored males of that age, are wholly inconsistent with the requirements of the constitution since its amendment above mentioned, requiring all colored, as well as white, males, over twenty-one years of age, to be represented in the apportionment for legislative purposes.

It is settled law, in this and other states, that a constitutional amendment, inconsistent with previous constitutional provisions and legislative enactments, operates to repeal such constitutional provisions and legislative enactments.   *Griebel* v. *State, ex rel.,* 111 Ind. 369, and authorities there cited; *Pierce* v. *Delamater,* 1 Comstock, 17; Potters Dwarris Statutes, 113; Sedg. Statutory Law, 107.

The learned counsel for appellee not only frankly concede, but earnestly insist, that all apportionment acts prior to that of 1879 have been repealed by the above mentioned constitutional amendment, and that

the only act not so repealed or declared by this court to be unconstitutional, is that of 1885. So that it is undeniable that all legislative apportionment acts, previous to that of 1879, have been effectively repealed. All apportionment acts, subsequent to that of 1885, as well as the act of 1879, have been adjudged unconstitutional by this court. *Parker* v. *State, supra; Denney* v. *State, supra.* There are several reasons why the act of 1885 has not been repealed.

1.   There has been no constitutional amendment, either State or federal, adopted since its enactment inconsistent with its provisions.

2.   The several apportionment acts of 1891, 1893, and 1895, assuming to supersede it, having proven unconstitutional, the repeal in each one of these acts, falls to the ground by the settled adjudication of this court, because it appears, from the several repealing clauses, that it was only intended to repeal the former apportionment acts upon the supposition that the new act was to take the place of the former acts upon the subject. *Denney* v. *State, supra; State, ex rel.,* v. *Blend,* 121 Ind. 514, and cases there cited. And a third reason is that it is justly held, in *Denney* v. *State, supra,* that the legislature may not wantonly sweep away all means of electing another legislature.

Thus we are confronted with the preliminary question, to be determined before we enter upon the investigation of the alleged unconstitutionality of the apportionment act of 1885. And that question is, can the appellee have any right to invoke the power of this court to dissolve the State government? Can any citizen of this State have the right to invoke the power of the judiciary by injunction to put an end to the government that protects his life, his liberty, and his property?

The proposition the appellee presents, stripped of

all subterfuges, is that unless the Governor shall convene the legislature in extra session, there shall be no more elections of legislatures in this State under our constitution. But suppose we respond to the demand of the appellee, and, having entered the field of investigation, find the act of 1885 defective, and strike it down, and start the people of this State on a voyage that may lead them into the troubled sea of anarchy; and suppose, even, that the Governor shall forego his resolution not to call an extra session of the legislature, and should actually convene it, and it should refuse to act, or, consenting, should pass another act as bad as the one passed in 1895, and which this court should be compelled to declare unconstitutional? The government of the State would be at an end. As was said in *Denney* v. *State, supra,* the people in the constitution have provided that all officers, except members of the legislature, shall hold their respective offices during the term for which they were elected and until their successors are elected and qualified. We may notice, in passing, that such provision points unerringly to the design of the framers of the constitution that the functions of government, executive and administrative, should not come to an end for want of persons authorized to perform them. But as to members of the general assembly, for important and obvious reasons, a different rule was provided. That rule is that each member's official career and authority ends with the end of the term for which he is elected, whether his successor is elected or not. Therefore, if there is no law in force for the election of a legislature, and the existing legislature expires without enacting such a law, the legislative department of the State government is at an end. The other two departments must soon expire, if there be no legislative department. A careful study of the whole

subject convinces us that it was the intention of the framers of the supreme law to impress on its every feature the principle of perpetuity in the government. If the scheme of the appellee may be effectuated, that noble aspiration of the founders of our State government may be defeated at the suit of a single individual, by the invocation of the power they vested in the judiciary. As before observed, if the legislative department may be thus annihilated, the other two departments must soon perish for want of sustenance by the legislative department. And all departments being thus extinguished, the constitution also must die. Because, in that event, society must be reorganized, and the constitution would have no force unless adopted by the new organization. As well ask this court to overthrow, not one provision of the constitution, but every provision of the whole constitution. The case before us, though undoubtedly not so intended, is, in reality, an attack upon the integrity of the State government. This court, while free to consider and decide causes at such times and in such manner as to it shall seem right and proper, under the constitution and the law, yet can never be authorized so to act as to put an end to its own existence, or to the existence of any co-ordinate branch of the State government. Any law, however defective, must stand so long as such law is necessary for the continued movement of the political organization formed by the people. It was in this spirit that the framers of the constitution provided, in Art. 4, section 5, "That the first and second elections of members of the general assembly, under this constitution, shall be according to the apportionment last made by the general assembly before the adoption of this constitution."

A reference to the apportionment so confirmed will

Fesler, Clerk, *et al. v.* Brayton.

show that it was not constructed in accordance with the provisions of the supreme law itself; and yet, it is confirmed and adopted for the simple and all sufficient reason that some law was necessary under which a legislature might be chosen. Even a defective law would be upheld, rather than that there should be no law for the election of a general assembly.

The constitution of the United States itself would compel the recognition of such a law for the election of a legislature as valid, at least until another could be enacted to take its place. In Art. 4, section 4, of the Federal Constitution, it is provided that, "The United States shall guarantee to every State in this Union a republican form of government;" and it is impossible for us to conceive of a republican form of government without the election by the people of representatives in the general assembly.

The principle which required that the last apportionment law under our old constitution should be held valid, and which requires, also, that the law of 1885 should be held valid, notwithstanding any constitutional defect which might exist in either, is not essentially different from the principle, in accordance with which invalid proceedings in the government of municipalities are legalized by acts of the legislature, namely, that the life of the municipality, in the one case, and the State, in the other, should be preserved. The State cannot die; and neither this court nor any other tribunal is authorized to do aught that may endanger its existence.

In like manner, in a constitutional monarchy, it is not admitted that any interval of time exists between the death of one ruler and the accession of another. The cry of the herald is the voice of the law: "The king is dead; long live the king!" So here, also, when a great president was stricken down by the hand of

an assassin, there was heard, in the voice of one des-
tined to be his successor, that sublime and inspiring
declaration, "The government at Washington still
lives!" It will not be admitted, either in the nation
or in the State, that the government, or any of its co-
ordinate branches, shall ever cease to exist. The
machinery set in motion by the people for the crea-
tion of the legislature, the executive, and the courts,
is, so to say, a living organism, and can never cease to
act. Least of all, should the judiciary, the guardian
of the constitution, aid in destroying the government,
which has its very being in the constitution.

The learned counsel for the appellee do not deny
that these consequences would follow the overthrow
of the act of 1885, in case of failure of the Governor
to convene the legislature in time to pass a new ap-
portionment act previous to the approaching Novem-
ber election, or, in case of his convening that body,
it should fail to pass a valid apportionment act. But
some of them insist that the idea that the executive
or legislature either will fail to do their duty, is un-
thinkable. We presume counsel mean, by this word,
that it is impossible to grasp the idea with our
thoughts that the Governor will, or might fail to con-
vene the legislature in time, or that the legislature
might fail to pass a valid apportionment law, in time
for the election in November next. We find no diffi-
culty whatever in grasping the idea.

The like has happened before. Both the Governor
and the legislature have heretofore failed in duty, as
to apportionment laws in a marked and startling
manner, as we shall see further on.

But, if we are bound to presume that the Governor
and the legislature will perform the duty resting on
each, in case the act of 1885 is void and out of date,

then there is no cause for interference by a court of equity by the strong arm of injunction.

The court being bound not to think the unthinkable idea that those departments will fail in their duty, there is no necessity for interference by a court of equity. There must be such a necessity, or no right to such relief can be demanded. See the authorities cited further on as to this point. See also 10 Am. and Eng. Ency. of Law, 779, 782, and authorities there cited in notes, and especially note 1, beginning on page 779. Others of appellants' learned counsel urge that we must enter the field of investigation of the unconstitutionality of the act, regardless of consequences. That is, as we interpret their contention, we are bound to go forward, even though we dash the people over the precipice into the bottomless pit of anarchy, and let the consequences take care of themselves. Such a doctrine is utterly inadmissible. It is an established principle of equity jurisprudence, that if there is "a probability that more wrong will be done than prevented by the injunction prayed for, it will not be granted." 10 Am. and Eng. Ency. of Law, 783, and authorities cited.

It is a matter of current history and common notoriety, as also appears by the record, that the persons who have finally consented to lend this suit their sanction and support, saw clearly the perilous sea into which it was likely to lead the ship of State, and entered their solemn and patriotic protests, and yielded only such consent on a formal refusal of the executive of the State, to a visiting committee, requesting him to call an extra session of the legislature to pass an apportionment act. What right can the appellee have to invoke the power of this court by injunction, to do what he cannot do directly, namely,

to coerce the Governor to exercise a discretionary power vested in him? One department of the government cannot coerce another to exercise a mere discretionary power. *Hovey, Gov.,* v. *State, ex rel.,* 127 Ind. 588. He has already refused to act. This suit, therefore, means to end the State government or to coerce the Governor.

The preliminary question confronting us is very different, indeed, from that presented in either of the cases of *Parker* v. *State, supra,* or *Denney* v. *State, supra.* In each of those cases the plaintiff, in his complaint, showed that the officers were threatening to proceed under an invalid law, and refusing to proceed under a valid law. Any citizen has a right to demand that public officers shall desist from proceeding under an invalid law, and proceed under a valid law, if there is such valid law, to hold elections. But that is a very different thing from a demand that no election shall be held at all, and that the wheels of government shall stop. Both of the apportionment cases above referred to proceeded upon the idea, and in fact left standing an apportionment act under which elections might be held, in case the other departments of the government failed to supply a better one.

This court, in *Denney* v. *State, supra,* in the principal opinion by Howard, J., said: "This court, in the case of *Parker* v. *State,* * * * expressly held that the constitutionality of the * * * act of 1885 was not before the court for adjudication, and accordingly refrained from making any decision in regard to it. Neither has the constitutionality of the apportionment act of 1885 been questioned in the case at bar. Consequently that act is the last, and perhaps the only, expression of the legislative will left upon the subject of apportionment, and under which senators and representatives may be chosen at the general elec-

tion of 1896, unless the Governor should see fit to call
a special session of the legislature to pass a new ap-
portionment law." And in the concurring opinion of
Hackney, C. J., it was said: "The act of 1885 stands
upon the statute book unchallenged. * * *
Whether that act shall continue unquestioned;
whether the people will follow the custom in such
cases and make their election under that law; or
whether that custom will be abandoned, and public
officers will refuse to follow it, and thereby defeat the
constitutional object to convene an assembly in 1897,
depends upon the wisdom and patriotism of the peo-
ple." These words in both opinions are no idle words.
They are full of meaning and relative significance.
They are no mere *obiter dicta*. But they express the
kernel of the principle that gave the plaintiff in that
case a standing in court; entitling him to invoke the
power of the judiciary to declare the act of 1895 un-
constitutional, and that gave the defendants the right
to invoke the same power to declare the act of 1893
unconstitutional. These words show that this court
did not mean to accord a hearing to one who invoked
its power to strike down the last barrier between the
people and helpless and almost hopeless anarchy, as
is attempted to be done in this case. That holding
was in accord with the holding in *Parker* v. *State*,
*supra*, which was strictly followed in the Denny case.
In the Parker case it was said on that point, by
Elliott, J., in his dissenting opinion, that: "If, how-
ever, it be conceded that it is necessary to decide such
questions, and to adjudge either of those acts void,
then it is indispensably necessary to designate a valid
law, either in the statutes or constitution, under which
legislators can be chosen, for it is inconceivable that
no law exists providing for legislative elections."
With this proposition, the majority of the court did

not disagree. It will be thus seen that the principle that gave the complainant a standing in each of these cases was, that the relief demanded by him did not strike down all, or the last and only law providing for legislative elections. We are not legally called upon to decide whether the act of 1885 is constitutional or unconstitutional, until the preliminary question first mentioned is decided in favor of the appellee, namely, has he a right to invoke that power vested in the judiciary? It was further said upon this point by Elliott, J., in his concurring opinion in *Parker* v. *State, supra,* that: "Constitutional questions will not be decided unless the party demanding their decision makes it evident that he has a right to require the court to decide them." To the same effect is *Henderson, Aud.,* v. *State, ex rel.,* 137 Ind. 552.

In *Laughlin* v. *President, etc.,* 6 Ind., at p. 228, it is said: "Nor ought the process of injunction to be applied but with the utmost caution. It is the strong arm of the court, and to render its operation benign and useful, it should be exercised with great discretion, and only upon necessity." In no case can injunctive relief be awarded except to protect some right of the complainant. *Edwards* v. *Haverstick, Admr.,* 47 Ind. 138; *Alexander* v. *Mullen,* 42 Ind. 398; *Sutherland* v. *Lagro, etc.,* 19 Ind. 192; *McCowan* v. *Whiteside,* 31 Ind. 235.

The appellee's complaint, instead of showing that he has a right to invoke the power of this court to strike down the last existing apportionment law, shows the direct contrary. That he has the right to invoke the power of this court, if, indeed, it possess that power to knock out the key-stone of the arch that upholds the fair fabric of the State government, is self-evidently untrue. As already observed, the con-

stitution, as originally adopted, provided, that the previous apportionment law should continue for the first and second legislative elections thereafter. This discloses the intention clearly enough, that there should never be a time when there should be no apportionment law, under which legislative elections might be held. Both the first and second legislatures elected thereafter, failed to obey the mandate of the new constitution to pass an apportionment law. But the third legislature was elected by the people without question under the old apportionment law, which was, by the literal words of the constitution, only to last for the first and second legislative elections under the new constitution; the old law having been framed before the new constitution, and was not framed on the lines prescribed therein for apportionment acts. The third legislature was that of 1857, and it passed the first apportionment act under the new constitution, and though that instrument commanded that body to pass one every six years, yet it failed to pass another for ten years thereafter, the next one being that of 1867. And we note that the Governor also failed to convene the legislature in extra session, if that was his duty, for the purpose of passing an apportionment law on the occasion of each one of the legislative failures above mentioned.

And the legislature has failed on four other occasions to perform this duty, namely, in 1879, 1891, 1893, and in 1895, by passing unconstitutional and void acts. In view of these historical facts, it does not look as if the idea of such failures of duty on the part of the executive and legislative departments of the government were altogether unthinkable.

It is again urged that if we may not respond to the demand of the appellee to investigate the unconstitutionality of the act of 1885, because it is the only one

in existence, there is no remedy against unconstitutional apportionment acts. Not by any means. We do not mean to depart in the least degree from the rigid rules laid down in *Parker* v. *State, supra,* and *Denney* v. *State, supra,* but on the contrary, we affirm them in their broadest terms. When the next apportionment act is passed, we will be free to inquire into its constitutionality, because the act of 1885 will stand until a valid law takes its place. This is the theory upon which the constitution is built.

While the framers of that sacred instrument and the voters who adopted it were all still living, they construed it to mean that the existing apportionment law, whether good or bad, in or out of date, must continue in force until a new one is enacted to take its place; and that the government shall not be brought to an untimely end because of the failure of the legislature to perform the duty enjoined upon it by the constitution. Suppose the third legislative election under the new constitution was about to take place, and that some one, fonder of curiosities and of tinkering with a loaded gun than of the safety of himself and others, had brought suit to enjoin the holding of that election, on the ground that there was no apportionment law, the legislature having failed to enact one, and the one provided in the constitution having expired by the express terms of the constitution; the courts, and especially this court, wherein then sat those who had helped to make the new constitution, would have answered such demand by saying, that it was no more intended by its makers that there should ever come a time, under that instrument, when there should be no law in existence authorizing legislative elections, than that the Creator designed that in Him man should live, move and have his being without breath.

The just fame of its authors would be greatly marred, if it was contemplated by them that by the failure of any officer, or body of officers, under that constitution to discharge the trust reposed in them by the people, and perform the duty enjoined by its provisions, a time might come when we would have no law in existence authorizing legislative elections, and the people have no security against approaching anarchy, chaos, and revolution, than a mere trust in good luck, or the good will of any man or set of men.

If these great men made such a rope of sand out of the constitution, their fame has been undeserved. But the contrary is true.

They never intended that the people should have no other security against anarchy and revolution than good luck.

Our conclusion is, that as the act of 1885 is the only law that has not been repealed or adjudged unconstitutional, under which an election of members of the legislature can be held in November, 1896, the appellee has no right to invoke the powers of the courts to declare it unconstitutional. And that, therefore, the complaint did not state facts sufficient to constitute a cause of action, and that the superior court erred in overruling the demurrer thereto.

The judgment is reversed, with instructions to sustain the demurrer to the complaint.

## SEPARATE OPINION.

JORDAN, J.—I concur in the result reached in this appeal, but not in all the reasoning of the opinion of Judge McCabe. It may be conceded that the apportionment act of 1885 is replete with the evils that were condemned by this court, under the decisions in the cases of *Parker* v. *State*, 133 Ind. 178, and *Denncy* v. *State*, 144 Ind. 503. I am of the opinion, however,

that the appellee, who seemingly brought this action in the lower court in behalf of himself and other electors of the State, has not timely exercised the right to assail the validity of the statute in controversy, and for that reason, at least, his case is devoid of equity, and, under the circumstances, he is not in a condition to demand that the court shall interpose and award the extraordinary writ of injunction to prevent the appellants, who are public officers, from doing the acts of which he complains.  The statute in dispute ran through an entire sexennial period, during which time it was acquiesced in by the people, and its validity was not challenged in any court, and under its provisions three successive general assemblies were elected by the voters of this State.  It is true, that during the time this statute was in active operation, it was criticised and denounced by the public press and upon the stump, yet no attempt was made to assail it in court, during the running of its sexennial period, and thereby secure a judicial determination of its validity.  It is a familiar maxim that equity aids the vigilant, and not those who sleep upon their rights.  It promotes diligence in a suitor, and punishes his "laches" by denying his request for the relief which he might have obtained had he applied therefor in due season.  I fail to recognize anything, under the circumstances, in the case at bar, which will shield the appellee from the force and effect of the salutary rule to which we have referred.  As stated heretofore, the great body of the State's electors seem to have accepted this statute, and biennially, for the period of six years, exercised the right to elect representatives and senators thereunder; and now, after the elapse of this period, and at a time when it is conceded by his counsel, that there remains no

other law under which the next general assembly can be elected, the appellee invokes the judiciary to inquire into the constitutionality of the act in question and grant the extraordinary relief demanded, regardless of the consequences that may follow.

It is manifest, I think, that, under the *status* occupied by the appellee and the circumstances of the case in general, this cannot be done without violating the fundamental principles of equity. It is not apparent that any special beneficial results will inure to the appellee, if the statute in question should be adjudged to be invalid; while upon the other hand, injurious ones might result to the public, hence, under such circumstances, it is evident that equitable rules do not require a court to award the relief requested by the appellee. It is true, as contended by the eminent and learned counsel for the latter, as a general proposition, that courts have nothing to do with the consequences that follow from their decisions; yet, under the state of facts in this cause, the question of the probable results that the public may sustain, if a decision should be adverse to the statute in dispute, becomes a potent factor in deciding whether the relief sought by the action should be granted. Again, it may be said that if under the existing emergency, the Governor declines to convene the present general assembly, in extra session, to enact an apportionment law, and thereby the electors are virtually driven to elect under the act of 1885, members of the house of representatives, and successors to the senators who were elected in 1892, it cannot, in reason, be urged that the courts ought to interpose and forbid them to exercise the right of so doing.

The judgment should be reversed, and the lower court directed to sustain the demurrer to the complaint, for want of equity.

## DISSENTING OPINION.

MONKS, J.—I dissent from both the reasoning and the conclusion reached in the prevailing opinion.

The apportionment act of 1885, tested by the principles established in the cases of *Parker* v. *State*, 133 Ind. 178, and *Denney* v. *State*, 144 Ind. 503, where this court held the apportionment acts of 1879, 1891, 1893, and 1895 unconstitutional, is clearly and without doubt unconstitutional and void. It is not a law, and is inoperative for any purpose. It confers no rights; it imposes no duties; it affords no protection, and is the same as if it had never been passed. *Johnson* v. *Board, etc.*, 140 Ind. 152, on p. 156; *Strong* v. *Daniels*, 5 Ind. 348; *Sumner* v. *Beeler*, 50 Ind. 341; Cooley Const. Lim. (6 ed.), 222; Black Const. Law, 64, section 37.

It is not the judgment of a court that renders a statute unconstitutional, but the fact that it is in conflict with some provision of the constitution. A statute, therefore, that is repugnant to any provision of the constitution is void before, as well as after it is so adjudged. The fact that no court has ever passed upon the question does not render such statute constitutional and valid. Therefore, the apportionment act of 1885 is no more valid and binding than the apportionment acts of 1891, 1893, and 1895, which have been adjudged unconstitutional by this court. This court has uniformly held, that when it clearly appears that a statute is repugnant to or in conflict with any provision of the constitution, it is the plain duty of the courts to declare it null and void. *Campbell* v. *Dwiggins*, 83 Ind. 473, 480; *Parker* v. *State, supra,* on p. 187; *Denney* v. *State, supra.*

Indeed, it is not claimed, in the prevailing opinion, that the apportionment act of 1885 is constitutional;

but it is not held invalid for the sole reason given, that it is the only statute on that subject, and that if held invalid, the Governor may not call a special session of the general assembly, or, if he does, the general assembly may not enact a constitutional apportionment law, and anarchy may follow.

In response to a suggestion of like character, in *McPherson* v. *Blacker*, 146 U. S. 1, the court, by Chief Justice Fuller, said:

"It is argued that the subject-matter of the controversy is not of judicial cognizance, because it is said that all questions connected with the election of a presidential elector are political in their nature; that the court has no power finally to dispose of them; and that its decision would be subject to review by political officers and agencies, as the State board of canvassers, the legislature in joint convention, and the Governor, or finally Congress   *   *.   The question of the validity of this act, as presented to us by this record, is a judicial question, and we cannot decline the exercise of our jurisdiction upon the inadmissible suggestion that action might be taken by political agencies in disregard of the judgment of the highest tribunal of the State as revised by our own." This doctrine was approved by the Supreme Court of New Jersey in *State* v. *Wrightson* (22 L. R. A. 548), 56 N. J. L. 126.

It is the duty of each department of the State government to act in the discharge of all duties, upon the presumption that the other departments will properly perform all duties incumbent upon them.   It is only when the action of the several departments of the State government is governed by this rule that its perpetuity and safety are assured.   Any other course tends to bring confusion and anarchy.   This court, therefore, should decide all questions properly pre-

sented, upon the presumption that the executive and legislative departments of the State government will not neglect any duty or fail to perform any function imposed upon them by the constitution. There is much less danger of anarchy by this course than for this court to declare an unconstitutional law valid, or decline to pass upon the question of its constitutionality, for the reason that the other departments named might fail or refuse to perform the duties imposed by the organic law. The suggestion that either the legislative or executive department of the State government might fail or refuse to perform the duties imposed by the constitution as a reason why this court should not adjudge the apportionment act of 1885 unconstitutional, as it clearly is, or as a reason why this court should decline to pass upon that question, is certainly, in the language of Chief Justice Fuller, "inadmissible," and should not be considered by the court; to do so is an unwarranted reflection on the co-ordinate branches of the State government.

In *Parker* v. *State, supra,* decided in December, 1892, before the meeting of the general assembly in January, 1893, this court said: "If, at the next ensuing election, the State is without a valid law, creating senatorial and representative districts under the enumeration of 1889, the responsibility must rest with the legislature, and not the judicial department of the State government."

This same argument was also considered and answered in the apportionment cases decided by the Supreme Courts of Michigan and Wisconsin.

In *Giddings* v. *Blacker,* 93 Mich. 1 (16 L. R. A. 402), Morse, C. J., said: "We do not care to go further, since there is a remedy in the hands of the executive and Legislature. The consequences of this decision are not for us. It is our duty to declare the law, to

point out the invasion of the Constitution, and to forbid it."

In *State* v. *Cunningham*, 81 Wis. 440 (15 L. R. A. 561), Pinney, J., said: "No difficulty, it is believed, need be apprehended as to the result of the decision the court has felt it to be its imperative duty to make; and our respect for the executive of the State, whose duty it is 'to take care that the laws are faithfully executed,' forbids any apprehension that he will fail in the least in meeting the present emergency, or to take such measures as in his wisdom seem best to give full effect to the constitution and the laws."

In the same case, Lyon, J., said: "Neither is the jurisdiction of the court affected, or the exercise thereof embarrassed, by the fact that this decision may leave the State without a valid legislative apportionment law, and hence without any law for the election of another legislature. The Governor may convene the present legislature, if he deems it his duty to do so, and when so convened, there can be no doubt of its power to enact a valid legislative apportionment law."

In the Legal Tender Cases, 12 Wall. 457, Mr. Justice Strong, in delivering the opinion of the court, referred to the situation of the country when the acts were passed, and the "great business disarrangement, widespread distress and rank injustice" that would result if said acts were held invalid; but he added, "the consequences of which we have spoken, serious as they are, must be accepted if there is a clear incompatibility between the constitution and the Legal Tender Acts."

The proposition that this court should hold an unconstitutional law valid, or refuse to pass upon the question of its validity because some other department of the government might fail or refuse to per-

form the duties imposed upon it by the organic law, is a dangerous and vicious doctrine, and is not, I think, sustained by reason, and is clearly against the great weight of the authorities.

Neither can I concur in the proposition that the people, having acted upon the apportionment act of 1885, by electing three successive general assemblies under it, that it is now too late to raise the question of its validity. The authorities cited, in support of this doctrine, have reference to actions to enforce private rights concerning property, and can have no application in a case like the one before us. This court, in *Denney* v. *State, supra,* said: "Neither do we think there was any estoppel here, as in the case of *Vickery* v. *Board, etc.,* 134 Ind. 554, to which we are referred. There the party bringing suit to enjoin levy of taxes to pay for bonds issued on purchase of a toll road, had waited until he received the benefit of the bonds before asking the court to declare unconstitutional the law under which they were issued. Here, while there may be some question of private or personal benefit, yet the issue before the court is much broader. The action concerns all the people of the State in their most enlarged and sacred relations of citizenship, and government, and the case cannot be tied up with the purely private rights of any one. It is true, that an action to test the constitutionality of the law, if brought at all, should have been pressed to a final determination in the first place. * * Yet the people of the State, in their sovereign capacity, cannot, for such reasons, be estopped from asking for the determination of the validity of a law under which it is now proposed they shall elect their next legislature. When the people of the State appear at this bar with such an issue, there can be no question of estoppel.

The inquiry is one reaching to the foundations of the government."

In *Parker* v. *State, supra,* this court held that the ap-portionment act of 1879 was unconstitutional, not-withstanding three successive general assemblies had been elected thereunder, and more than thirteen years had elapsed since its enactment. Yet it has only been eleven years since the apportionment act of 1885 was passed. Lapse of time, however, cannot, in a case like the one at bar, render an unconstitutional statute valid or secure from attack, or deprive the people of their right to question its validity. We think the cor-rect doctrine was declared in *State* v. *Wrightson, supra,* on p. 208, quoting the language of Judge Cooley: *"Acquiescence for no length of time can legalize a clear usurpation of power, where the people have plainly ex-pressed their will in the constitution, and appointed judicial tribunals to enforce it."*

The subject of acquiescence in unconstitutional ap-portionment statutes, as affecting the right of an elector to have the validity of the act determined, was considered by the Supreme Court of New Jersey in *State* v. *Wrightson, supra,* where it was claimed that a particular method of apportionment had been ac-quiesced in ever since the adoption of the constitution by all parts of the State government and by the peo-ple, and that therefore it was no longer subject to question. But it was held by the court that this doc-trine had no application whatever in a case where it appeared that mandates of the constitution had not been obeyed. The court said: "The constitution con-tains the permanent will of the people. It is para-mount to the power of the legislature, and can be re-voked or altered only by the power which created it. Popular government can be maintained only by up-holding the constitution at all times and on all oc-

casions as it was when it came from the hands of the
people, by whose fiat it was established as the funda-
mental articles of government, to abide until altered
by the authority which created it.   To adopt the lan-
guage of Chief Justice Bronson, in *Oakley* v. *Aspinwall*,
3 N. Y. 568: 'There is always some plausible rea-
son for the latitudinarian constructions which are re-
sorted to for the purpose of acquiring power—some
evil to be avoided, or some good to be attained by push-
ing the powers of the government beyond their legiti-
mate boundary.   It is by yielding to such influences
that constitutions are gradually undermined, and
finally overthrown.   *   *   *   One step taken by the
legislature or the judiciary in enlarging the powers of
the government opens the door for another, which
will be sure to follow; and so the process goes on,
until all respect for the fundamental law is lost, and
the powers of the government are just what those in
authority please to call them.'

"Within the domain of construction there is room for
argument and discussion—nay, even for a diversity of
opinion; but when the meaning of the constitution, in-
terpreted by its letter and in its spirit, is ascertained,
extraneous considerations are of no avail.   In the pro-
cess of construction, long usage and practical inter-
pretation are entitled to great weight if the language
be obscure or doubtful; but such extraneous consid-
erations cannot be allowed 'to abrogate the text' or
'fritter away its obvious sense.'

"I have already said that, on a construction of the
words of the constitutional provision regulating this
subject, fortified by the policy and institutions which
prevailed in this State prior to the framing of the con-
stitution, and a comparison of other of its provisions,
the constitutional mandate requires the election of
members of the general assembly by the legal voters

of the counties respectively, and that the division of counties into assembly districts and the distribution of the members among these districts for the purpose of electing such members is in conflict with the constitutional mandate. No one can examine the legislation on this subject from 1871 to the present time and contemplate the results without realizing the evils which have been fostered under this system. Relief from these wrongs through the ballot box cannot be assured, the majority in the legislature being elected under this system by a minority of the legal voters of the State. Precedent has been followed by retaliation, to be repeated from time to time as supremacy in the legislature has passed from one political party to the other. For this condition of affairs the only remedy is by a return to constitutional methods."

It is said in Cooley Const. Lim., 87, note, in criticising the action of certain courts in declaring a statute to be constitutional which was not: "But it would have been interesting and useful if either of these learned courts had enumerated the evils that must be placed in the opposite scale when the question is whether a constitutional rule shall be disregarded; not the least of which is, the encouragement of a disposition on the part of legislative bodies to set aside constitutional restrictions, in the belief that, if the unconstitutional law can once be put in force, and large interests enlisted under it, the courts will not venture to declare it void, but will submit to the usurpation, no matter how gross and daring. We agree with the Supreme Court of Indiana, that, in construing constitutions, courts have nothing to do with the argument of *ab inconvenienti*, and should not 'bend the Constitution to suit the law of the hour.' *Greencastle Tp.* v.

*Black*, 5 Ind. 557, 565; and with Bronson, Ch. J., in what he says in *Oakley* v. *Aspinwall, supra.*"

It is now more than five months until the next general election, and ample time remains for the proper authorities to take such steps as may be deemed necessary to protect the rights of the people, and see "that the laws are faithfully executed."

If, however, the election were so near at hand that such steps could not reasonably be taken, the court might, perhaps, properly withhold its decision until after the election was held; but in no event would the court be justified in adjudging that an unconstitutional apportionment act was valid, or, in refusing to pass upon the question of its validity; to do so is to disregard the provisions of the constitution, which every officer is sworn to support.

It is proper to say that the quotation made in the prevailing opinion, from the separate opinion of Elliott, J., in *Parker* v. *State, supra*, is from that part of the opinion in which he expresses his dissent from the action of the majority in declaring the apportionment act of 1891 unconstitutional, and that the language quoted gives one of the reasons he urged why the court should not pass upon the question.

The majority of the court, however, passed upon the question, and held said act unconstitutional.

The judgment should be affirmed.