## Butcher, Appellant, v. Rice.

Argued May 6, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused August 10, 1959.

160

*Edward G. Bauer, Jr.* and *George M. Brantz,* for appellants.

*Harry J. Rubin,* Deputy Attorney General, with him *Anne X. Alpern,* Attorney General, for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, June 30, 1959:

The plaintiffs, Harry K. Butcher, Samuel H. Rosenberg and Frank W. Dressler, as citizens, electors and taxpayers of the City and County of Philadelphia and residents respectively in the County's Fourth, Sixth and Eighth Senatorial Districts, instituted this suit in equity in the Court of Common Pleas of Dauphin County in an effort to enjoin the Secretary of the Commonwealth from certifying candidates or holding elections for the office of State Senator from the Philadelphia districts, on the ground that the Apportionment Act of May 10, 1921, P. L. 449, as amended by the Act of April 26, 1923, P. L. 106, 25 PS §2201 et seq., is unconstitutional.

The complaint alleges that the eight senatorial districts within Philadelphia County are not "as nearly equal in population as may be" as enjoined on the General Assembly by Article II, Section 16, of the Pennsylvania Constitution[1] but, on the contrary, are in fact

---

[1] "The State shall be divided into fifty senatorial districts of compact and contiguous territory as nearly equal in population as may be, and each district shall be entitled to elect one Senator. Each county containing one or more ratios of population shall be entitled to one Senator for each ratio, and to an additional Senator for a surplus of population exceeding three-fifths of a ratio, but

enormously disproportionate with respect to their population; that the General Assembly has not apportioned the State into senatorial districts as required by Article II, Section 18, since the decennial census of 1950;[2] and that the Act of 1921 violates the free and equal election provision of Article I, Section 5, of the Pennsylvania Constitution and "the equal protection of the laws" clause of the Fourteenth Amendment of the Federal Constitution. The complaint also prayed, in the alternative, a decree ordering the holding of an election at large in Philadelphia County for the eight offices of State Senator (to which that County is constitutionally limited) until the General Assembly shall reapportion the senatorial districts within Philadelphia County. Evidently recognizing the widely accepted rule of law that courts are without power to compel the Legislature to act affirmatively to perform even a constitutional duty (*Fergus v. Marks*, 321 Ill. 510, 152 N.E. 557), the complainants did not join the members of the General Assembly as parties defendant.

The Secretary of the Commonwealth, as defendant, filed an answer admitting all of the factual averments of the complaint. The Secretary also filed a suggestion

no county shall form a separate district unless it shall contain four-fifths of a ratio, except where the adjoining counties are each entitled to one or more Senators, when such county may be assigned a Senator on less than four-fifths and exceeding one-half of a ratio; and no county shall be divided unless entitled to two or more Senators. No city or county shall be entitled to separate representation exceeding one-sixth of the whole number of Senators. No ward. borough or township shall be divided in the formation of a district. The senatorial ratio shall be ascertained by dividing the whole population of the State by the number fifty."

[2] "The General Assembly at its first session after the adoption of this Constitution, and immediately after each United States decennial census, shall apportion the State into senatorial and representative districts agreeably to the provisions of the two next preceding sections."

that the complaint be dismissed for the plaintiffs' failure to join members of the General Assembly as indispensable parties to the suit. Since the pleadings presented only questions of law, the plaintiffs moved for judgment. The motion was heard by the court en banc, with the assent of the parties, as on final hearing. The court in a formal and well-considered opinion held that it was without power to grant the relief sought, even if the members of the General Assembly were joined as parties defendant, and accordingly entered a final decree dismissing the complaint and giving judgment for the defendant. From the decree so entered the plaintiffs took this appeal.

What the plaintiffs seek is a judicial declaration that the Act of 1921, as amended, is unconstitutional. Since the antecedent Apportionment Acts of February 17, 1906, P. L. 31, and of May 19, 1874, P. L. 197, would, by the same token, be unconstitutional, the Commonwealth would be without a senatorial apportionment act and the General Assembly would thereby be under the immediate necessity of reapportioning the State's senatorial districts on the basis of the latest decennial census. Equity affords no jurisdiction for judicial intervention in the circumstances pleaded. The General Assembly's failure to divide the State into senatorial districts since the decennial census of 1950 raises a purely political question and whether the extant Apportionment Act of 1921 divides the State into senatorial districts "as nearly equal in population as may be" is not justiciable but rests alone in the discretion of the General Assembly.

The political nature of the problem is fully considered in the case of Colegrove v. Green, 328 U. S. 549, 552. In that case the plaintiff brought an action in the United States District Court for the Northern District of Illinois to restrain certain State administrative of-

ficials from conducting congressional elections pursuant to the provisions of an Illinois statute establishing congressional districts. The District Court dismissed the complaint and the United States Supreme Court affirmed. While the ultimate decision was by a closely divided Court, the case has since been frequently cited with approval by the Supreme and other Federal Courts and numerous State Courts. The opinion in conformity with the decision was written by Mr. Justice FRANKFURTER who was joined by two other Justices. Mr. Justice BLACK, who filed a dissenting opinion, was also joined by two other Justices. The determining decisional factor was the vote for affirmance by Mr. Justice RUTLEDGE who stated in his concurring opinion that equity should decline to exercise its jurisdiction because of the peculiar circumstances present in the case. The following from Mr. Justice FRANKFURTER'S opinion has since been widely quoted with approval,—"We are of opinion that the appellants ask of this Court what is beyond its competence to grant. This is one of those demands on judicial power which cannot be met by verbal fencing about 'jurisdiction.' It must be resolved by considerations on the basis of which this Court, from time to time, has refused to intervene in controversies. It has refused to do so because due regard for the effective working of our Government revealed this issue to be of a *peculiarly political nature* and therefore not meet for judicial determination." (Emphasis supplied)

The above quoted reasoning from *Colegrove v. Green*, supra, subsequently prevailed in the closely analogous case of *MacDougall v. Green*, 335 U. S. 281, 284. There, an injunction was sought against an Illinois statute which prescribed procedures for the formation and recognition of a new political party. The complainants alleged that the statute discriminated against the most populous counties of the State. The Supreme

Court, citing *Colegrove v. Green,* supra, refused to grant the requested relief.

In *South v. Peters,* 339 U. S. 276, 277, the plaintiff challenged the validity of Georgia's county unit election system. He contended that the voters in the most populous county of the State have an average of about one-tenth of the political weight of those in other counties. The Supreme Court affirmed the dismissal of the plaintiff's petition citing *Colegrove v. Green,* supra, and *MacDougall v. Green,* supra.

Likewise, in *Turman v. Duckworth,* 329 U. S. 675, the plaintiffs attacked the constitutionality of Georgia's county unit system as it applied to the selection of a candidate for Governor in the primary election. A three-judge federal court, in refusing to grant the relief sought, stated (68 F. Supp. 744, 747-748), "Here equity is asked to interfere to achieve or frustrate a political result, and that through the discretionary remedy of injunction. Whether it be that the subject matter is not of equitable cognizance, or merely that equity should withhold its hand, we think the decision in Colegrove v. Green, 66 S. Ct. 1198, requires us to deny equitable relief." The Supreme Court of the United States dismissed the appeal and directed the District Court to dismiss the bill.

Again, in *Kidd v. McCanless,* 352 U. S. 920, where the issues raised were very similar to those presented in the instant case, the Supreme Court of Tennessee (200 Tenn. 273, 292 S.W. 2d 40) refused to entertain a suit challenging the constitutional validity of legislation providing for apportionment of election districts for Senators and Representatives of the General Assembly. The Supreme Court, in refusing to interfere with the decision of the Supreme Court of Tennessee, unanimously entered an order dismissing the appeal, citing *Colegrove v. Green,* supra.

In *Anderson v. Jordan*, 343 U. S. 912, the Supreme Court of California had denied a petition for a writ of mandamus seeking to compel the Secretary of State of California to disregard certain California reapportionment statutes (See 20 U.S.L.W. 3252). Just as in the case now before us, the plaintiffs had contended that the statutes were unconstitutional. The Supreme Court of the United States dismissed the plaintiff's appeal, citing *Colegrove v. Green*, supra, and *MacDougall v. Green*, supra.

Somewhat earlier, the Supreme Court, in *Wood v. Broom*, 287 U. S. 1, had before it a case in which a citizen of Mississippi had sought in the United States District Court an injunction to restrain certain State officers from conducting congressional elections pursuant to an allegedly invalid redistricting State Act. The court granted the injunction. On appeal to the Supreme Court, the members of the Court unanimously agreed that the decree should be reversed and the complaint dismissed. Mr. Chief Justice HUGHES, who wrote the opinion for the Court, found it unnecessary to consider the questions raised as to the right to relief in equity or as to the justiciability of the controversy. However, a brief concurring opinion reads in part as follows: "Mr. Justice BRANDEIS, Mr. Justice STONE, Mr. Justice ROBERTS, and Mr. Justice CARDOZO are of opinion that the decree should be reversed and the bill dismissed *for want of equity . . . .*" (Emphasis supplied). In *Colegrove v. Green*, supra, Mr. Justice FRANKFURTER, after discussing the above quoted concurrence, added "we also agree."

By far, the greater weight of authority holds that equity is without jurisdiction to entertain a complaint concerning a Legislature's action or failure to act with respect to its constitutionally imposed obligation to apportion a State into districts for the election of sena-

tors and representatives. In addition to the cases already referred to in support of the principle many more to the same effect might be cited. A brief review of a few additional should suffice.

In *Radford v. Gary*, 352 U. S. 991, plaintiffs brought an action to compel the Legislature of Oklahoma to reapportion the election districts for the Senate and House of Representatives of the State. The District Court of the United States (145 F. Supp. 541, 543) dismissed the complaint, citing and quoting from *Colegrove v. Green*, supra, that "the issue was one of a 'peculiarly political nature and therefore not meet for judicial determination.' " The decree of dismissal was unanimously affirmed by the Supreme Court, citing *Colegrove v. Green*, and *Kidd v. McCanless*, supra.

In *Perry v. Folsom*, 144 F. Supp. 874, 877, a citizen of Alabama brought suit in equity against the members of the Legislature and certain administrative officers of the State seeking a decree directing the defendants to enact a constitutionally valid statute reapportioning the State's Legislative Districts. The Court, citing, inter alia, *Colegrove v. Green*, supra, dismissed the bill. The opinion concluded that "The issue presented is of a political nature."

Also, in *State ex rel. Broughton v. Zimmerman*, 261 Wis. 398, 52 N.W. 2d 903, 910, plaintiffs attacked the constitutionality of the Act establishing districts for members of the Senate and Assembly of Wisconsin. The Supreme Court of the State, after quoting from *Colegrove v. Green*, supra, declared that "Because controversies over apportionment are ordinarily political in nature, courts should be hesitant to intervene therein."

The Supreme Court of Oklahoma refused to interfere with the existing senatorial apportionment statute of that State even though it was argued that the Act violated the express provisions of the Constitution of

Oklahoma. *Latting v. Cordell*, 197 Okla. 369, 172 P. 2d 397. The court said that ". . . the framers of our constitution had no thought in mind other than to delegate the duties of apportionment solely to the legislature."

The decisions in the foregoing cases are practical applications of the well recognized rule stated in Pomeroy, Equity Jurisprudence, Vol. 4, §1753 (4th ed.) as follows: "An injunction will not issue, as a general rule, for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held . . . . Moreover, the effect of interference in such matters might often result in the destruction of the government. This is especially so when the relief is sought to prevent the holding of an election . . . . Thus, an injunction will not issue to restrain the holding of an election although it is alleged that it is without authority of law, *or that the act authorizing it or providing for apportionment is unconstitutional.*" (Emphasis supplied). The same rule is otherwise stated in 10 Ruling Case Law 342, as follows: "Matters of a political character are also outside the pale of a court of equity, no such jurisdiction having ever been conceded to a chancery court, either in a federal or state judiciary, unless it is so provided expressly or impliedly by organic or statute laws. . . . Neither in England nor America has this power been suffered to extend to political affairs." Also, as succinctly stated in 30 C.J.S., Equity, §66, "Questions purely political or governmental in their nature cannot be heard or determined by a court of equity . . . . Generally, matters pertaining to elections are deemed to be purely political questions and hence outside the scope of equitable jurisdiction."

It is clear beyond question that equity is without jurisdiction to grant the relief which the appellants

here seek. For support of their contention to the contrary, they rely on *Commonwealth ex rel. v. Crow*, 218 Pa. 234, 236, 67 A. 355, where, in a brief per curiam opinion, this court, after stating that "The substantial question involved is the constitutionality of the senatorial apportionment by the Act of February 17, 1906, P. L. 31" said, "On the general jurisdiction to consider and pass upon that question we entertain no doubt. The judicial power extends to the review of all legislative acts for the comparison of their provisions with the requirements and prohibitions of the constitution, and there is no exception expressed or implied in regard to statutes of apportionment." We do not disagree with what was there said although the statement was plainly a dictum, as will be readily apparent.

The proceeding before the court was a suggestion by the Commonwealth for a writ of quo warranto on the relation of a private citizen who was seeking to obtain the respondent's office as Senator for the 32nd Senatorial District. What this court held was that the relator was without standing to question the respondent's right to the office, and accordingly quashed the writ. The constitutionality of the Apportionment Act of 1906 was neither discussed, considered, nor passed upon.

This court did not assert in the *Crow* case, supra, that equity will take jurisdiction to order the General Assembly to carry out the duty imposed upon it by the Constitution to apportion the State into elective districts for senators and representatives. The illustration, which the court's opinion gave of instances where equity *would* take jurisdiction to invalidate an Apportionment Act, makes plain what the court had in mind and, with that, we fully agree. If an Apportionment Act should fail to follow the definitely fixed constitutional specifications as, for instance, by dividing the

State into sixty or a hundred senatorial districts instead of fifty or by giving one county more than a sixth of the whole number of senators, a court of equity would, of course, strike down the transgression. Indeed, that is exactly what happened in *Shoemaker v. Lawrence*, 45 Dauphin 111, and *Lyme v. Lawrence*, 45 Dauphin 322. There the Apportionment Act of June 30, 1937, P. L. 2443, relating to Representatives' Districts, and the Act of June 30, 1937, P. L. 2454, relating to Senatorial Districts, were respectively held unconstitutional because of their factual errors. In some instances, the Acts left out entirely certain territories and, in others, included non-contiguous territories within the same district and enumerated certain political subdivisions which did not exist. Equity's jurisdiction to prevent enforcement of an apportionment act, *which contains patent factual defects or errors,* was unquestioned.

The constitutional enjoinder on the General Assembly to divide the State into districts "as nearly equal in population as may be", by the very elasticity of the phrase, does not admit of error judicially reviewable. And whether or when the General Assembly will carry out the duty imposed upon it by the Constitution of dividing the State into districts for the election of senators and representatives poses a non-justiciable question whereof equity will not take jurisdiction.

Even if it were to be held that the plaintiffs' assault on the constitutionality of the Act of 1921, as amended, on the grounds assigned by the appellants, presented a justiciable question cognizable in equity, still the chancellor's grace would rightly be withheld for the reason that a declaration of the Act's unconstitutionality (and that is as far as the court could go) would benefit no one but would seriously disrupt and render chaotic the State's government.

To be specific, an election of senators at large, for which the plaintiffs pray, pending the Legislature's senatorial reapportionment of the State, is not legally possible. Article II, Section 16, after providing that the State should be divided into fifty senatorial districts, provides further that "each district shall be entitled to elect one Senator." Manifestly, there could not be an election of senators at large when they must be elected by districts. It would indeed be vain for a court to order the Secretary of the Commonwealth to do something which cannot be done constitutionally.

Again, and this is still more ominous, if the Act of 1921, as amended, were to be declared unconstitutional, a most serious question would at once arise concerning the validity of legislation enacted by the Senate subsequent to the determination that the Act, defining the senatorial districts under which members of the Senate had been elected, was unconstitutional. It was the considered opinion of the Supreme Court of Tennessee that, in such an eventuality, the Legislature would lose its powers. Thus, in *Kidd v. McCanless*, supra, that court declared ". . . there can be a *de facto* body or office only until there has been a judicial determination of the invalidity of same. . . . It seems obvious and we therefore hold that if the [Apportionment] Act of 1901 is to be declared unconstitutional, then the *de facto* doctrine cannot be applied to maintain the present members of the General Assembly in office. If the Chancellor is correct in holding that this statute has expired by the passage of the decade following its enactment then for the same reason all prior apportionment acts have expired by a like lapse of time and are non-existent. Therefore, we would not only not have any existing members of the General Assembly but we would have no apportionment act whatever under which a new election could be held for the election of

members to the General Assembly. . . . The ultimate result of holding this Act unconstitutional by reason of the lapse of time would be to deprive us of the present Legislature and the means of electing a new one and ultimately bring about the destruction of the State itself."

In like regard, the Supreme Court of Wisconsin in *State ex rel. Martin v. Zimmerman,* 249 Wis. 101, 23 N.W. 2d 610, 612, said,—". . . if [the apportionment act] had become void and legislators elected since 1941 were not chosen from legal and constitutional legislative districts, then would we have a qualified and lawful body to enact a valid reapportionment statute? It is unnecessary, because of the validity of ch. 27, to rely on a theory that legislators elected to office from unconstitutional or nonexistent districts, have by some doctrine of de facto officialdom based on de facto legislative districts, a right to exercise the important duties necessarily entering into a fair and just apportionment. *Once it is determined that the present incumbents are not de jure officers, they have no color of authority and could not serve as de facto officers.* 46 C.J. §367, p. 1054; Ekern v. McGovern, 1913, 154 Wis. 157, 142 N.W. 595, 46 L.R.A., N.S., 796." (Emphasis supplied). See also *Fesler v. Brayton,* 145 Ind. 71, 44 N.E. 37, and *State ex rel. Winnie v. Stoddard,* 25 Nev. 452, 62 P. 237, which hold that an apportionment act will not be held invalid when there is no prior valid act on which to fall back.

The same would be equally true were the Act of 1921, as amended, to be declared unconstitutional for the judicially non-reviewable reason that the senatorial districts which the Act of 1901 established are not "as nearly equal in population as may be."

The result is that equity is without jurisdiction to entertain the plaintiffs' complaint that the Act of 1921,

as amended, is unconstitutional on the ground that the senatorial districts which it apportioned are not "as nearly equal in population as may be" or that the Act is outlawed by lapse of time. Even if equity should take jurisdiction of the complaint, the chancellor, on a balancing of the prospective relative harm to the complainants and to the public, would be constrained not to declare the Act unconstitutional but leave to the General Assembly correction of anything in the Apportionment Act needing correction.

The court below correctly dismissed the bill for want of a justiciable controversy.

Decree affirmed at appellants' costs.

Mr. Justice McBRIDE took no part in the consideration or decision of this case.

----

DISSENTING OPINION BY MR. JUSTICE BELL:

Appellants, in their capacity as citizens, duly qualified electors and taxpayers of the Commonwealth of Pennsylvania, and of the City of Philadelphia, for themselves and for other electors and taxpayers, filed a complaint against John S. Rice, Secretary of the Commonwealth, seeking (1) an injunction to restrain defendant (a) from certifying to the Philadelphia County Board of Elections the names of any candidates for the office of State Senator in and from any of the eight senatorial districts within Philadelphia which were established by the Act of May 10, 1921, P. L. 449, and (b) from issuing any Certificates of Election to the office of State Senator within said districts, and (2) further equitable relief.

Defendant filed an answer which admitted all the facts, and admitted that the present Senatorial Reapportionment Act was a plain violation of the Constitution of Pennsylvania, and admitted that "a Justiciable

State Issue is Present", but denied that the Courts had any power to direct the Legislature to pass a Constitutionally valid Reapportionment Act, or to direct an election at large for State Senators, or to grant any kind of affirmative relief.

The people make the Constitution; the legislature makes the law; the Governor executes the law; the Courts are the guardians of the Constitution and the law and the rights of the people thereunder; and we must never fear or fail to carry out our duty.

### The Mandate of the Constitution

The Constitution of Pennsylvania provides in Article I:

"DECLARATION OF RIGHTS. That the general, great and essential principles of liberty and free government [under and in accordance with the Constitution] may be recognized and unalterably established. We declare that [there then follow many provisions of declarations of rights, and limitations on the power of government including]:

"*Elections.* Article I, Section 5. Elections shall be free and equal . . ."

Article II, [which deals *with the Legislature,* provides pertinently] *"Apportionment of the State.* Section 18. The General Assembly at its first session after the adoption of the Constitution *and immediately after each United States decennial census,** shall apportion the State into senatorial and representative districts agreeably to the provisions of the two next preceding sections." Section 16 provides: "The State shall be divided into fifty senatorial districts of compact and contiguous territory *as nearly equal in population as may be,* and each district shall be entitled to elect one

---

* Italics throughout, ours.

senator . . . No city or county shall be entitled to separate representation exceeding one-sixth of the whole number of senators [all agree that this limits Philadelphia to eight senators] . . ." Section 17 provides for an apportionment for members of the House of Representatives.

The lower Court found, and all parties agree that the last Senatorial Reapportionment was by Act of May 10, 1921,* and that the last Reapportionment for the House of Representatives was made on the basis of the United States decennial census of 1950 by Act of July 29, 1953.

The present State senatorial districts within Philadelphia are so grossly unequal in population and so discriminatory and unjust as in some cases to reach the disproportion of more than 5 to 1. A similar situation with the same disproportion of more than 5 to 1 exists in a number of senatorial districts throughout the State, with a net result that Montgomery County, Delaware County and Allegheny County are each entitled under a proper senatorial apportionment to one additional senator. Article II, Section 18, of the Constitution clearly and mandatorily requires the General Assembly to apportion the State into senatorial districts "immediately after each United States decennial census." When this mandate is not obeyed by the Legislature, many citizens (a) are deprived of a free, fair and equal election which the Constitution guarantees, and (b) of the representatives to which they are entitled under the Constitution.

Article VII, Section 1, of the Constitution provides: "Senators and Representatives and all judicial . . . officers shall . . . take and subscribe the following oath . . . 'I do solemnly swear . . . that I will support, obey

---

* A minor and presently irrelevant amendment was passed on April 26, 1923, P. L. 106.

and defend the Constitution of the United States and the Constitution of this Commonwealth, and that I will discharge the duties of my office with fidelity; . . .' " It is clear and indisputable, as the lower Court found and as all the parties admit, that the Legislature—for political or selfishly personal or other reasons—have intentionally and deliberately failed to obey the mandate of the Constitution which they swore to support and obey. Indeed, the Attorney General of Pennsylvania in his brief in the Court below, thus described the situation:

"The existing pattern of apportionment of the Pennsylvania State Senate is intolerable. It represents a deviation from democratic principles sufficiently significant in degree as to defy rational support. It perpetuates a legislative structure so alien to mid-twentieth century social and economic forces that it contributes to an immobilization of effective state action in a myriad of fields. And, certainly, it tends to promote a cynicism toward our legislative institution destructive of the values necessary to the proper functioning of a free society. Defendant seeks not to support the present apportionment of the State Senate on its merits, for it has none."

Under all the facts which admittedly and indisputably show a deliberate violation of the Constitution by the Legislature, do the Courts have power (1) to prevent a further violation of the Constitution and (2) to grant appropriate relief? The answer is obviously and beyond the shadow of any doubt "Yes"!

## Power of Courts To Enjoin a Violation of the Constitution

The Legislature of Pennsylvania passed a Senatorial Apportionment Act in 1874, another on February

17, 1906 and the last one on May 10, 1921. The Act of 1921, which was based on the United States decennial census of 1920, was valid when enacted; but it is equally clear that it is inapplicable and *invalid today* because it is *not* based upon the United States decennial census of 1950, and it (and the Act of 1906) clearly and unquestionably (as the lower Court found and as all parties admit) apportions the State into senatorial districts which violate the Constitutional provisions of Article II, Section 18 and Section 16. *Rights which are ordained by the Constitution would amount to nothing if there is no way to protect them.* When we demand free and fair elections in Germany and elsewhere throughout the world, doesn't it seem strange that we unwittingly deprive many citizens of Pennsylvania of the fair and equal election which our Constitution ordains and guarantees to them.

Probably the most fundamental and the most important powers and duties of the Courts are to interpret and support the Constitution and to pass upon the Constitutionality and validity of a statute. As the present Chief Justice said in *Hertz Drivurself v. Siggins et al.*, 359 Pa. 25, 58 A. 2d 464 (in which the Court declared the Act of June 5, 1943 to be unconstitutional) : "But, equally well settled, federally, since Marbury v. Madison, 1 Cranch 137, 175-180 (1803), and for Pennsylvania even a few years earlier, is the rule that a law repugnant to the Constitution is void and that it is *not only the right but the duty of a court* so to declare when the violation unequivocally appears: see Respublica v. Duquet, 2 Yeates (Pa.) 492, 501 (1799) ; cf. also Eakin v. Raub, 12 S. & R. (Pa.) 330, 339 (1825)."

The Court's power includes, of course, the power and duty to enjoin a statute which was valid when enacted but has expired by its terms, or has become constitutionally invalid, or is invalid as applied to the

particular complainants.* It would seem unnecessary to cite authorities for anything which is so obvious, but if authority be needed there are many.

In *Nashville, Chattanooga & St. Louis R. R. v. Walters,* 294 U. S. 405, 415 (1935), the Court (speaking through Justice BRANDEIS) said: "A statute valid when enacted may become invalid by change in the conditions to which it is applied."

In *Flynn v. Horst,* 356 Pa. 20, 51 A. 2d 54, the Court said (pages 30, 31-32): "While a court should hesitate to declare a statute unconstitutional until clearly satisfied of its invalidity, and where it has been on the statute books for many years the hesitation should be all the greater, yet, if such an act is plainly in conflict with the organic law of the state, old age cannot give it life, and when the issue of its constitutionality is properly raised, it must be declared void. We have never ruled to the contrary. In Com. v. Hazen, 207 Pa. 52, an act was declared unconstitutional after it had been on the books for thirty-two years, and in Orkney Street, 194 Pa. 425, after thirty-three years; and many other like instances could be cited.*

. . .

"In U. S. v. Carolene Products Co., 304 U. S. 144, at page 153, the Supreme Court of the United States in an opinion by Justice, later Chief Justice, STONE said: 'The constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged *by showing to the court that those facts have*

---

* The Courts frequently apply this principle in the interpretation and application of zoning statutes and zoning ordinances. See *Garbev Zoning Case,* 385 Pa. 328, 335, 122 A. 2d 682; *Lukens v. Ridley Township Zoning Board,* 367 Pa. 608, 614, 80 A. 2d 765; *Taylor v. Moore,* 303 Pa. 469, 472, 154 A. 788.

* In *Hallmark Productions, Inc. v. Carroll,* 384 Pa. 348, 121 A. 2d 584, the Board of Censors which had censored motion pictures for 41 years was declared to be unconstitutional.

*ceased to exist.'* In Chastleton Corporation et al. v. Sinclair et al., Rent Commission of the District of Columbia et al., 264 U. S. 543, Justice HOLMES, speaking for the Supreme Court, said: '. . . A law depending upon the existence of any emergency or other certain state of facts to uphold it, may cease to operate if the emergency ceases *or the facts change even though valid when passed.'* In Perrin v. United States, 232 U. S. 478, it was said that a prohibition by act of Congress against the sale of liquor on lands ceded by Indians to the United States within the limits of a State may become inoperative when all the Indians affected thereby become completely emancipated from Federal control."

The Act of 1921 demonstrates that the Legislature itself intended it to continue in effect for a period of only about ten years, because the Act provided by its terms that it was to continue in effect only "until the next United States decennial census is taken and an apportionment made thereon". Even without such language, the Act could validly continue in effect, under the provisions of the Constitution, only until the next United States decennial census was taken and a new apportionment made thereunder as soon thereafter as reasonably practical.

Defendant denies that the Courts of Pennsylvania have the right or power to invalidate an apportionment statute or to restrain or interfere with a State or local election no matter how invalidly held or conducted, since these are exclusively matters for the Legislature. This contention is completely devoid of merit. The Courts decide controverted matters in election cases in each county in Pennsylvania nearly every time an election is held. Even more convincing and conclusive, it is an indisputable fact (1) that the most important power and duty of a Court, which is inherent and inalienable, is, we repeat, to interpret and support the

Constitution, and to pass upon the Constitutionality and the validity or invalidity of a statute: *Hertz Drivurself v. Siggins,* 359 Pa., supra; and (2) that prior decisions of the Courts of Pennsylvania have specifically sustained the power and right of the Court to determine the validity of an apportionment statute *and when invalid, to restrain its operation and enforcement:* *Commonwealth v. Crow,* 218 Pa. 234, 67 A. 355; *Armstrong v. King,* 281 Pa. 207, 126 A. 263; *Shoemaker v. Lawrence, Secretary of the Commonwealth,* 45 Dauphin 111 (1938); *Lyme v. Lawrence,* 45 Dauphin 322 (1938). See to the same effect the decisions of the highest Courts of our sister states: *Attorney General v. Suffolk County Apportionment Commissioners,* 224 Mass. 598; *Smiley v. Holm,* 285 U. S. 355; *Brown v. Saunders,* 159 Va. 28; *Ragland v. Anderson,* 125 Ky. 141; *Dyer v. Kazuhisa Abe,* 138 F. Supp. 220; *Parker v. State ex rel. Powell,* 133 Ind. 178; *Denney v. State ex rel. Basler,* 144 Ind. 503; *Giddings v. Blacker,* 93 Mich. 1; *State v. Cunningham,* 81 Wis. 440; *Lamb v. Cunningham,* 83 Wis. 90; *State v. Stoddard,* 25 Nev. 452; *State v. Wrightson,* 56 N.J.L. 126; *Harmison v. Ballot Com'rs.,* 45 W. Va. 179; *Williams v. Secretary of State,* (Mich.) 108 N.W. 749; *Commissioners v. Blacker,* 92 Mich. 638; *People v. Thompson,* 155 Ill. 451; *People v. Rice,* 135 N. Y. 473; *Baird v. Supervisors,* 138 N. Y. 95; *State ex rel. Donnell v. Osburn, Speaker of the House of Representatives,* 347 Mo. 469 (1941), 147 S.W. 2d 1065.

*Commonwealth v. Crow,* 218 Pa., supra, involved the Constitutionality of a Senatorial Apportionment Act. In that case a person claiming to have been rightfully elected to the office of senator was held not to have a status to bring an action in the form of a writ of quo warranto in the name of the Commonwealth. However, the Court said (page 236) : "The substantial question involved is the constitutionality of the sena-

torial apportionment by the Act of February 17, 1906, P. L. 31. On the general jurisdiction to consider and pass upon that question we entertain no doubt. The judicial power extends to the review of all legislative acts for the comparison of their provisions with the requirements and prohibitions of the constitution, and there is no exception expressed or implied in regard to statutes of apportionment. The constitution requires that the state be divided into fifty senatorial districts, and if, for illustration, the apportioning statute created sixty or 100 districts there could be no question of the power and duty of the court to declare the statute void. Other transgressions may be less obvious, but are none the less open to question and decision."

In *Armstrong v. King*, 281 Pa., supra, this Court *sustained a bill to enjoin* the Secretary of the Commonwealth from notifying—pursuant to joint resolutions adopted by the Legislature—the County Commissioners throughout the State to print on the official ballots a proposed amendment to the Constitution approving a bonus for World War I veterans in violation of Article XVIII of the Constitution which provides that "no amendment or amendments shall be submitted oftener than once in five years". In that case, as in this case, defendant vigorously contended that the Court was without jurisdiction and was impotent, and dire threats were made as to the results which would follow the Court's action if it attempted to restrain the Secretary of the Commonwealth, especially as this Constitutional (five year) provision had been ignored and violated on four previous occasions. Nevertheless, this Court, we repeat, held that the Act (Joint Resolutions) of the Legislature was Unconstitutional and void, and enjoined the Secretary of the Commonwealth and mandatorily prohibited a vote on the bonus in that election year because it would have violated the Constitution. The Court said (page 213) : "For the purpose of an-

tagonizing this inevitable conclusion [of unconstitutionality], we are told that the practice has been to submit proposed amendments without reference to the five years' limitation; that large sums have been loaned on the faith of the people's approval of amendments thus submitted; and that these loans will be imperiled, if we sustain the contention made upon this point. If this were so, it would be a cause of much regret; but we would nevertheless be required to uphold the Constitution and ignore the erroneous practice, whatever the result might be . . . ."

In *Shoemaker v. Lawrence, Secretary of the Commonwealth*, 45 Dauphin County Reports 111, the Court restrained the Secretary of the Commonwealth from receiving nomination papers and from certification of nominations or elections and from any other act for the holding of elections for members of the General Assembly in Counties or Districts established by the Act of June 30, 1937, P. L. 2443, because the Act was unconstitutional for the reason that certain Districts were therein formed from territory which is not contiguous, and there was inequality in the Districts created by the Act.

In *Lyme v. Lawrence*, 45 Dauphin County Reports 322, the Court declared the Senatorial Apportionment Act of 1937 to be unconstitutional and restrained the Secretary of the Commonwealth from all proceedings under the Act because a borough in Allegheny County was not included in any Senatorial District as established by the Act, and some of the Districts violated the contiguous territory requirement of the Constitution, and some violated the equality provision of the Constitution.

Notwithstanding these authorities which specifically authorize and require this Court to grant injunctive relief, defendant contends that the Courts have no

182

way or means to *enforce* their decrees, and for this additional reason are powerless to issue and enforce a decree to enjoin a State officer from any certification with respect to a State election to be held under an invalid statute. As a corollary, defendant contends that the people of Pennsylvania have no way or means *to compel* the Legislature to obey the reapportionment mandate of the Constitution since there is no provision for placing the issue on the ballot and consequently the sole power of enforcing obedience to this clear mandate of the Constitution lies in the Legislature which is deliberately violating it. One cannot help wondering what defendant's contention would be if the Legislature had failed to pass an Apportionment Act after 1874, or if it had never passed any Apportionment Act. Would the Courts and the people in such an event be powerless?

Defendant's contention, viz., "lack of power to enforce a Constitutional mandate or a Court decree, or to restrain any violation thereof," while often heard in the last few years in the South, is a strange and novel doctrine to advocate in the State of Pennsylvania today. It had its origin in the famous statement of President Jackson in 1831 (when he refused to aid in the enforcement of the decree of the Supreme Court of the United States in *Cherokee Nation v. State of Georgia*, 5 Peters 1) : "John Marshall* has pronounced his judgment; let him enforce it if he can." It is history that the decree of the Supreme Court of the United States was enforced in spite of Jackson's angry challenge.

But we do not have to go back to 1831 to support the power of the Supreme Court to make and enforce its decrees (1) which (a) interpret the Constitution, and (b) void Acts in violation thereof; and (2) which

---

* Chief Justice of the Supreme Court of the United States.

enjoin certain acts, and/or (3) mandatorily order other acts to be performed in accordance with its decree.

The aforesaid decisions of this Court, which are squarely and directly in point, are buttressed by recent decisions of the Supreme Court of the United States, which clearly sustain the right and the power and the duty of the Courts to restrain even the President of the United States from violating the Constitution. Neither the President of the United States, nor the Congress, nor a Governor, nor a Legislature has inherent autocratic or Constitutional absolute power, but in each case their power is authorized, limited and restricted by the Constitution—and any violation thereof will be enjoined by the Courts! ! !

In *Smiley v. Holm*, 285 U. S. 355, Minnesota, under the reapportionment following the fifteenth decennial census, became entitled to nine representatives in Congress, being one less than the number previously allotted. The Legislature redistricted the State, but the Governor returned the bill without his approval. In a suit brought by a citizen, elector and taxpayer of the State to obtain a judgment *declaring invalid* all filings for nomination for the office of representative in Congress, and *to enjoin* the Secretary of State from giving notice of the holding of elections for that office in divisions set forth in the Act the Legislature passed, the Supreme Court of the United States reversed the Supreme Court of Minnesota which had sustained a demurrer, and said (pages 374-375) : "Where, as in the case of Minnesota, the number of representatives has been decreased, there is a different situation as existing districts are not at all adapted to the new apportionment. It follows that in such a case, unless and until new districts are created, all representatives allotted to the State *must be elected by the State at large.* That would be required, in the absence of a redistricting act in order to afford the representation to which

the State is constitutionally entitled, and the general provisions of the Act of 1911 cannot be regarded as intended to have a different import."

In *Brown v. Saunders*, 159 Va. 28, Virginia, under the most recent census, lost one Congressman, and the Legislature failed to divide the State into nine Congressional districts instead of ten. Section 5 of the Virginia Constitution contained almost the identical language of Pennsylvania's Constitution. Virginia's highest Court issued a mandamus upon the Secretary of the Commonwealth, and said (page 47) : "Under the circumstances, we are forced to the conclusion, as already indicated, that chapter 23 of the Acts of Assembly of 1932 is invalid, and that it necessarily follows that there is no valid act reapportioning the nine representatives to which Virginia is entitled in the House of Representatives in Congress, and that *it will be necessary for the electors in the State at large*, to select the nine members to represent the State in the national legislature."

In *Attorney General v. Suffolk County Apportionment Commissioners*, 224 Mass. 598, the Constitution of Massachusetts had almost the same requirement as to representation and contiguous territory as does the Constitution of Pennsylvania. The Legislature had divided the State into unequal districts, according to the number of voters in each district. The Court said (pages 601, 607, 609-611) : ". . . Scarcely any right more nearly relates to the liberty of the citizen and the independence and the equality of the freeman in a republic than the method and conditions of his voting and the efficacy of his ballot, when cast, for representatives in the legislative department of government. It was said in the Opinion of the Justices, 10 Gray, 613, at page 615, 'Nothing can more deeply concern the freedom, stability, the harmony and success of a representative republican government, nothing more directly affect the

political and civil rights of all its members and subjects, than the manner in which the popular branch of its legislative department is constituted.'

. . .

". . . When fair-minded men from an examination of the apportionment and division can entertain no reasonable doubt that there is a grave, unnecessary and unreasonable inequality between different districts, the Constitution has been violated and it is the duty of the court so to declare. Baird v. Supervisors of Kings County, 138 N. Y. 95, 114.

. . .

"*Mandamus affords the appropriate form of relief.* It is the remedy to which resort usually is had to set aside the illegal performance of duty and to compel the performance of duty according to law, by public officers entrusted with discretionary, administrative or political functions when it is their duty to act. Flanders v. Roberts, 182 Mass. 524, 529. Cox v. Segee, 206 Mass. 380. Moneyweight Scale Co. v. McBride, 199 Mass. 503, 505. Attorney General v. Boston, 123 Mass. 460, 479. Rea v. Aldermen of Everett, 217 Mass. 427. Luce v. Board of Examiners of Dukes County, 153 Mass. 108. Keough v. Aldermen of Holyoke, 156 Mass. 403. Cheney v. Barker, 198 Mass. 356, 367. People v. Ammenwerth, 197 N.Y. 340.

. . .

". . . the division and apportionment of the county of Suffolk into representative districts already made and filed by the commissioners is void as not in conformity to the Constitution, and . . . the commissioners *must proceed 'as soon as may be'* to divide the county of Suffolk into representative districts so as to apportion the number of representatives assigned to that county 'equally, as nearly as may be, according to the relative number of legal voters' in the several districts,

and otherwise in conformity to the Constitution and to art. 21 of the Amendments to the Constitution, . . . ."

In *Youngstown Sheet and Tube Co. v. Sawyer* (Secretary of Commerce), 343 U. S. 579, the President of the United States (acting through his Secretary of Commerce), in order to avert a strike in the Steel Mills which "would immediately jeopardize our national defense", seized certain mills, claiming "inherent power" of seizure of property and removal of officers, under "the aggregate of his Constitutional powers as the Nation's Chief Executive and the Commander-in-Chief of the Armed Forces of the United States"; and further that such inherent power was "supported by the Constitution, by historical precedent, and by court decisions". The Supreme Court held that the President had exceeded his powers, and enjoined the Secretary from seizing the property of the steel companies even to avert a strike which would immediately jeopardize our National Defense.

The Courts have likewise enjoined a Governor. In *Faubus, Governor of Arkansas v. United States of America and John Aaron et al.*, 254 F. 2d 797, defendants brought a proceeding to enjoin the Governor, the Adjutant General of the State, and the Commander of the National Guard and others under their control, from using the National Guard to prevent eligible negro school children from attending Little Rock High School (a public school) pursuant to the Court's approved plan of integration. An injunction restraining the Governor of Arkansas and other important State Officials was affirmed by the United States Court of Appeals.

In *United States v. United Mine Workers of America*, 330 U. S. 258, the Supreme Court of the United States enjoined John L. Lewis, President of the United Mine Workers, from calling a strike and the Union from participating in a strike. The Supreme Court

thereafter found that Lewis and the Union had disobeyed the Court's injunctive decree and for this reason were guilty of both Criminal and Civil Contempt. For the criminal contempt the Court fined John L. Lewis $10,000 and the Union $700,000; and further ordered the Union to "pay an additional fine of $2,800,-000 unless the defendant union, within five days after the issuance of the mandate herein, shows that it has fully complied with the temporary restraining order issued November 18, 1946, and the preliminary injunction issued December 4, 1946." The Supreme Court of the United States had no army or money or material means to enforce its decree, but the fines were promptly paid.

In *Dyer v. Kazuhisa Abe*, 138 F. Supp. 220, the District Court of the United States sustained a complaint by a territorial voter against the Territorial Legislature and Governor of Hawaii, to obtain relief from failure to reapportion the territorial legislature in accordance with the Hawaiian Organic Act. The Court (1) held this failure deprived the voters of the equal protection of the law and constituted a denial of due process, and (2) ordered the Legislature to reapportion in accordance with the Act, the Order being equivalent to a mandamus. The Court, in an exceptionally able opinion by Judge McLAUGHLIN, said (page 236): "The time has come, and the Supreme Court has marked the way, when serious consideration should be given to a reversal of the traditional reluctance of judicial intervention in legislative reapportionment. The whole thrust of today's legal climate is to end unconstitutional discrimination. It is ludicrous to preclude judicial relief when a mainspring of representative government is impaired. Legislators have no immunity from the Constitution. The legislatures of our land should be made as responsive to the Constitution of the United States as are the citizens who elect the legislators."

In *Connett v. City of Jerseyville*, 7 Circuit 1941, 125 F. 2d 121, Judge (later Mr. Justice) MINTON, speaking for the Circuit Court, said (page 124) : ". . . the District Court entered a decree, the essential part of which reads as follows:

" 'The defendant City of Jerseyville, a municipal corporation, is now commanded forthwith, through its proper corporate authorities, to adopt a schedule of rates for the Jerseyville Waterworks which will produce sufficient income to pay the costs of operation, maintenance, provide an adequate depreciation fund and pay the interest upon the certificates of indebtedness owned by the plaintiffs and discharge the principal thereof within a reasonable time.'

. . .

"[1, 2] This action of the District Court is now challenged by the City on the ground that the court is without jurisdiction to do indirectly what it cannot do directly, namely, engage in the legislative function of fixing a rate schedule. But the court is not making a rate schedule. That is clearly the duty of the City. The court is merely compelling the City to do its duty, in conformity with the statute enacted by the State of Illinois, and when the City does its duty, it, and not the court, will be exercising the legislative power. The water rates will not be fixed in the decree of the court but in the ordinance of the city council. When the City is under duty to act and refuses to act, that is not an act of discretion, but an arbitrary act, contrary to law. Interstate Commerce Commission v. United States, 224 U. S. 474, 32 S. Ct. 556, 56 L. Ed. 849; Huidekoper v. Hadley, 8 Cir., 177 F. 1, 40 L.R.A., N. S., 505. When a court compels a city to do its duty as defined by statute, and to act, that does not control the discretion of the city as to how it shall act. Even though the court in its decree may incorporate the standards for action as laid down by the statute, as in the case at bar, it is

not an invasion of the City's discretion. State Board of Equalization v. People, 191 Ill. 528, 61 N.E. 339, 58 L.R.A. 513.

. . .

"[4] It must be apparent by now that the law of this case is that this court has the power and will exercise it to compel the City to perform its clear legal duty.

"Courts have for years compelled city councils to do their legal duty, though the performance of that duty may require the exercise of discretion and be in the performance of legislative functions, such as levying taxes. City of East St. Louis v. United States, 120 U. S. 600, 7 S. Ct. 739, 30 L. Ed. 798; Von Hoffman v. City of Quincy, 4 Wall. 535, 71 U. S. 535, 18 L. Ed. 403; City of Cairo v. Campbell, 116 Ill. 305, 5 N.E. 114, 8 N.E. 688; People v. Massieon, 279 Ill. 312, 116 N.E. 639.

"Indeed, regulatory bodies have been compelled by mandamus to assume jurisdiction and fix rates. Interstate Commerce Commission v. United States, 224 U. S. 474, 32 S. Ct. 556, 56 L. Ed. 849; State v. Lewis, 187 Ind. 564, 120 N.E. 129.

"In another case, the Interstate Commerce Commission had refused to follow the mandate of Congress requiring it to value certain railroad properties, on the ground that the mandate of Congress was impossible of performance. But the Supreme Court of the United States held that the Commission could be compelled by mandamus to proceed to the performance of its duties as laid down in the Act of Congress. Kansas City Southern Ry. Co. v. Interstate Commerce Commission, 252 U. S. 178, 40 S. Ct. 187, 64 L. Ed. 517."

The Supreme Court of the United States has in recent years greatly extended the power of the Courts— in the public interest—to uphold the Constitution and

to make it not a mere conglomeration of words, but a living omnipotent power. How broad and sweeping are the powers of the Courts is strikingly demonstrated by the so-called "Segregation Cases". In *Brown v. Board of Education*, 347 U. S. 483, and *Bolling et al. v. Sharpe*, 347 U. S. 497, which were followed and extended by later kindred cases, the Supreme Court ordered public schools to integrate white and negro children under and by virtue of the 14th Amendment to the Constitution which guarantees every citizen "equal protection of the law."*

The 14th Amendment to the Constitution did not mention "education" or schools; and the Supreme Court was never expressly or specifically given jurisdiction of these subjects. Furthermore, neither the Supreme Court nor the Circuit nor District Courts were ever given expressly or specifically the power (a) to restrain State Officers, or school authorities, or the President of the United States, or Governors and Legislatures, which they effectually do, or (b) to compel them, *which they effectually do,* to obey a mandatory affirmative Order or Decree of Court. The South vehemently resented the segregation-integration decisions, and vigorously contended that education and schools were matters State or local in nature; that the Supreme Court (and the lower Federal Courts) had no jurisdiction of such local questions; that the Court was usurping the powers of State Governments and the rights and powers which were reserved by the Tenth Amendment to the States and to the People of each State; that the Court's interpretation of the Constitution was unjustified, illegal, and unconstitutional; that the people of

---

* The Court reversed or completely nullified *Plessy v. Ferguson*, 163 U. S. 537 (1896), and *Gong Lum v. Rice*, 275 U. S. 78 (1927), which had established the "separate but equal" doctrine, as the meaning of the Fourteenth Amendment to the Constitution.

the South were not going to obey the mandate of the Supreme Court to integrate "with all deliberate speed";[**] and that the Supreme Court lacked the power and the means to enforce its Decree. Many people in the North believed that the Fourteenth Amendment did not mean, and was never intended to mean, what the Supreme Court *now for the first time* said it meant, but they believed that the decision and the mandate of the Supreme Court had to be complied with under our Constitutional Form and System of Goverment, even though its Decree *in practical effect both restrained and mandated Governors and Legislatures,* and even though the Court had no army or money or material or means to enforce its Decree. Many subsequent cases which have reached the District or the Circuit or the Supreme Court of the United States have demonstrated that the Courts have the power, and will exercise their power, to have their affirmative mandatory Orders and Decrees, as well as their injunctive Orders and Decrees complied with.[*]

It must be ironic, if not amusing, to Southerners to learn that Northerners now assert that the Constitu-

---

[**] *Brown v. Board of Education,* 349 U. S. 294, 301.

[*] Appellant also contends that it would be terribly difficult to draw a new Apportionment Act in accordance with the Constitutional requirements, and that this Court would create chaos if it restrained elections under the presently invalid unconstitutional Act of 1921. Of course there is no merit in these contentions. The only difficulty in drawing a valid Reapportionment Act is a "political" difficulty. Furthermore, when the Courts of Pennsylvania declared prior Apportionment Acts to be unconstitutional, no chaos resulted. If the Legislature which is in session wishes to avoid even the possibility of chaos, it can easily do so by forthwith passing a valid constitutional Reapportionment Act. Moreover, if "possible" chaos is legally sufficient to avoid the clear mandate of the Constitution, how can the Segregation decisions of the Supreme Court be justified when it knew that its decisions would undoubtedly produce chaos.

192

tion of Pennsylvania can be violated with impunity by our Legislature and our election officials, and that such violation is without remedy or redress, because the Supreme Court of Pennsylvania has no jurisdiction or authority or power or means to enjoin a violation of the Constitution or to make and enforce a mandatory Decree to compel an election for State Senators to be held in accordance with the Constitution of Pennsylvania and the will of the people!

The majority opinion, disregarding the controlling decisions of the Supreme Court of Pennsylvania, has cited some decisions from the Courts of our sister States (most of which do not have the same Constitutional mandate as does Pennsylvania) which hold that Congressional or even Legislative apportionment is purely political and questions dealing therewith should be shunned by the Courts. The majority relies mainly upon the leading case of *Colegrove v. Green*, 326 U. S. 549. In that case the Supreme Court refused to consider the validity, or the equities or inequities of a *Congressional* apportionment statute of Illinois, with its possible *resulting conflict between Congress and the State*. In the *Colegrove* case, 7 Justices sat; 3 Justices believed the Court had jurisdiction, 3 Justices believed it lacked jurisdiction, and 1 Justice believed the Court had jurisdiction but because of the facts in that case declined to exercise it. Net result—a majority of the Court believed that even as to Congressional apportionment, the Court possessed jurisdiction. It is clear that the *Colegrove* case does not deny Pennsylvania's jurisdiction to invalidate a State act providing for legislative reapportionment; on the contrary, if apposite, it supports it.

*MacDougall v. Green, Governor of Illinois*, 335 U. S. 281, is clearly inapposite. In that case complainants sought an injunction against the enforcement of a stat-

ute of Illinois, setting out the requirements for a new political party. The District Court found *want of Federal jurisdiction* and denied the injunction. The Supreme Court in a Per Curiam opinion held that a State has the power in pursuance of State policy to assure a proper diffusion of political initiative and that this would not violate any provisions of the *Federal Constitution.* We note parenthetically that even on this point, Justice RUTLEDGE concurred on the ground that equity should decline to exercise its jurisdiction because the question was presented on the eve of a national election; and Justice DOUGLAS, Justice BLACK and Justice MURPHY dissented. In their opinion they said that "free and honest elections are the very foundation of our republican form of government"; and held that several provisions of the Constitution of the United States were violated by the State act.

In *Kidd v. McCanless,* 352 U. S. 920, in *Radford v. Gary,* 352 U. S. 991, in *Turman v. Duckworth,* 329 U. S. 675, in *South v. Peters,* 339 U. S. 276, and in other cases not cited in the majority opinion, the Supreme Court of the United States merely entered Per Curiam (always with several dissents) "Judgment affirmed: see Colegrove v. Green, 328 U. S. 549, (and sometimes also) MacDougall v. Green, 335 U. S. 281." All these cases involved the question of whether a State's apportionment into legislative districts *violated the Federal* Constitution. In South v. Peters, supra, the Court, in a very brief Per Curiam opinion, stated that Federal Courts had consistently refused to exercise their equity powers in cases arising from a State's geographical distribution of electoral strength among its political subdivisions.

The aforesaid decisions of the Supreme Court, and particularly *Colegrove v. Green,* upon which the majority relies, have produced only uncertainty and con-

194

fusion in Bench and Bar as to exactly what they hold. They apparently hold that State Apportionment Statutes do not violate the Federal Constitution. Clearly, however, they do not decide that a State Court cannot determine the Constitutionality of a State act which apportions legislative districts. That, of course, is the key question in the present case; and it has been clearly and specifically decided by prior decisions of this Court that our State Courts possess such jurisdiction. In the light of all the decisions hereinabove quoted or cited, I am convinced that the Courts of Pennsylvania have the jurisdiction and the power, and in order to protect the Constitutional rights of the people of Pennsylvania, we have the duty to interpret and enforce obedience to the Constitution of Pennsylvania, and to restrain any violation thereof.

The majority opinion forecasts an ominous result if the Act of 1921 is now declared unconstitutional. It states that to enjoin any election thereunder *next November* would invalidate (a) all elections heretofore held under said Act and (b) all laws passed by Senators elected under said Act. This position fortunately is completely untenable! It has been clearly and convincingly answered and refuted in a learned opinion by Mr. Justice SIMPSON in *Armstrong v. King*, 281 Pa., supra. Where an *election* of Senators or Representatives has been held and laws or matters of public importance passed upon by legislators *elected by the people*, it is too late, years thereafter, to question their election or deny the validity of their Acts. This is so obviously in the public interest—indeed it is a public necessity—that it seems astonishing it should be questioned or doubted. The *recent segregation* decisions of the Supreme Court of the United States, as well as recent decisions of Federal Circuit and District Courts, have changed the timorous judicial concept that the

actions of a Governor or of a legislature or even of a President are "purely political" and therefore outside and beyond the jurisdiction of the Courts. These decisions have extended the jurisdiction and the power of the Courts and have effectually (1) restrained unconstitutional actions of the highest public officials, and (2) have *effectually compelled compliance* by a President, a Cabinet Officer, a Governor, high State officials and even legislatures with a mandatory provision of the Constitution, and an affirmative mandatory Decree of a Court. These decisions are based on the sound, solid, American ground that the people cannot and must not be left without any protection or redress in their fundamental American rights;* otherwise our Constitution would become a meaningless scrap of paper and our American System of Government, of which we are so proud, would be a hollow mockery.

The appellee (Secretary of the Commonwealth of Pennsylvania, speaking through the Attorney General of Pennsylvania) admits that "A Justiciable State Issue is Presented . . . appellee agrees that *the courts of Pennsylvania have jurisdiction to consider the validity of a reapportionment statute under the Pennsylvania Constitution* [and] . . . that the present statute, when tested by the constitutional requirements of approximate equality of population among districts, Art. II, §16, and of free and equal elections, Art. I, §5, violates those requirements . . . *the present apportionment . . . is unquestionably in conflict with the Constitution.* The area of dispute centers only around the problem of remedy." The Attorney General then argued (a) that the Legislature could not be mandamused into

---

* Including the right of suffrage,—which is even more important than the right of education—i.e., the right to freely choose and elect their representatives in accordance with the provisions of the Constitution.

passing a Constitutionally valid Reapportionment Act because they were not parties to the suit, and (b) that the Courts have no power to decree an election at large even if the members of the General Assembly are made parties-defendant. It is clear as crystal that the Attorney General agrees with the prior decisions of this Court which unequivocally hold—contrary to the majority opinion—that a Justiciable State Issue is Presented, and require this Court to hold as our bounden duty, that the Act of 1921 is now invalid and unconstitutional.

The fundamentals of our American Constitutional Government, the inherent and traditional powers of the Courts, the decisions of the Courts of Pennsylvania which are directly in point and which are buttressed, although no buttress is necessary, by recent decisions of the Supreme Court and of Circuit and District Courts of the United States, make clear beyond the possibility of a doubt (1) that the Courts of Pennsylvania have the right, the power, and the duty to enjoin the application and the enforcement of the presently invalid Senatorial Reapportionment Act of 1921 by the Secretary of the Commonwealth and by election officials in Philadelphia and throughout Pennsylvania; and (2) that any violation of this Court's injunctive Decree (a) will make an election under said Act void, and (b) will subject the Secretary and the election officials who disobey the Decree to severe penalties for contempt of Court.

I would hold that Article I, §5, and the clear mandate of Article II, §16 and §18, of the Constitution of Pennsylvania have been, without the slightest doubt, violated by the Legislature of Pennsylvania. I would likewise enter a Decree enjoining the Secretary of the Commonwealth from certifying to the Board of Elections of Philadelphia County and all other Counties

in Pennsylvania the names of any candidates for the office of State Senator in those districts for which an election is provided by the Act of May 10, 1921, and from certifying the election to the office of State Senator of any person within said districts.

I am confident that the Legislature's respect for our Constitution and our Courts, as well as the Will of the people of Pennsylvania, will not only compel obedience to such a Decree but will move the Legislature to *forthwith* pass a valid Constitutional Senatorial Reapportionment Act.*

---

* Plaintiff sought further relief, namely, that this Court mandatorily order the Legislature to pass, before its adjournment, Senatorial Reapportionment in obedience to the clear mandate of the Constitution and upon failure of the Legislature to do so within a reasonable time, Decree a general election. The Legislature is presently in session and will probably continue in session for another six weeks or two months. If it fails to reapportion the Senate at its present regular session, the Governor has the power under Article IV, §12, to call a special session of the Legislature for the purpose of passing a valid Reapportionment Act. The Governor, however, cannot compel the Legislature to act.

This intolerable situation would be clearly and completely cured by the following Constitutional Amendment which is recommended by the Commission on Constitutional Revision:

"Recommended. Before the close of each regular session of the General Assembly at which the officially certified figures of a United States decennial census first are available, the General Assembly shall apportion the Commonwealth into senatorial and representative districts. If the General Assembly fails to do so, the Governor shall, immediately after final adjournment, call the General Assembly into special session for the sole purpose of making the apportionments. At the special session there shall be no legislation on any other subject. The General Assembly shall not adjourn sine die until it has completed the apportionment into both senatorial and representative districts."

Under recent decisions of the Supreme Court of the United States, particularly in the segregation-integration cases, the Courts will not leave the people without any protection or redress in their fundamental Constitutional rights; and it would appear that upon

Mr. Justice BENJAMIN R. JONES joins in this dissenting opinion.

a proper suit at a proper time the Courts could mandamus the Legislature to perform its Constitutional duty, since Legislators, as well as Governors and Judges, should be made as responsive to the Constitution as are the citizens who elect them.